Today's case will be No. 25-1442, Kyle Fellers et al. v. Marcy Kelley et al. At this time, would counsel for the appellants please come to the podium and introduce themselves on the record to begin. May it please the court and hold cold for plaintiffs also in the courtroom are Rick Lehman and Nathan Restuccia. I would like to reserve three minutes for rebuttal. You may. Boa officials censored my clients and threatened them with exclusion and arrest for wearing pink wristbands bearing the black letters XX and they would do so again at future sporting events. These wristbands signify support for the widely held view that girls sports should be reserved for biological girls. The district court wrongly held this censorship of one view justified, but the court went even further holding that Boa officials actually had an affirmative duty to censor my clients and that the XX message could reasonably be seen as directly assaulting transgender students. This court should reverse because, first, Boa officials used explicitly viewpoint discriminatory criteria to censor my clients non-disruptive symbolic speech, second, Tinker and LM do not apply to adult speech in a limited public forum, third, passive expression of the widely held sociopolitical idea symbolized by the XX chromosomes message is neither harassment nor assault. Boa officials violate the cardinal rule of free speech law by openly discriminating against speech based on viewpoint. In the forum at issue, some views on gender identity are allowed, but others are not. The school district allows passive sociopolitical commentary on gender identity so long as the message is inclusionary, but not if the message is exclusionary as determined solely by Boa officials. So pride flags are in, but XX on a pink field is not. Excuse me, counsel. Can you just clarify one factual issue for me? Do you know the dimensions of the wristbands? I can't give you the exact measurements, but I... You just happen to have one with you? I just happen to have one with me. May we see it? So and the record does show, the testimony does show that these were ordered on Amazon and then customized with the XX on them. So they are breast cancer awareness wristbands that have been customized with the XX message. How many people actually wore them at the game? So we don't have an exact count, but it was a minimum of three people. My clients, Kyle Fellers, Andy Foote, Eldon Rash. Nicole Foote wanted to wear them, but she didn't end up putting it on. So the school system says, actually, we weren't discriminating against viewpoint discrimination. We were merely trying to prevent what they thought was targeting and demeaning message to the transgender students who attended the game and the specific athlete who was playing. Your response is, yes, it's viewpoint discrimination because your... The evidence is only that your clients saw at prior games gay pride t-shirts and symbols. So do I take it your viewpoint discrimination is based on a sort of comparator with the message your clients wanted to convey versus gay pride? That is one of the arguments, Your Honor, but I think... Okay, but can't one be both supportive of gay rights and opposed to transgender athletes playing? Absolutely. Okay, and doesn't the record show that Plaintiff Foote attended a September 24th, 2024, soccer game where there was a large protest against trans athletes in girls' sports by a group called Moms for Liberty, and they also wore wristbands, and the school system took no action? I believe the testimony at the hearing, Your Honor, was that they felt there were too many people for them to take action, but they didn't like it, and they did feel that it violated their policy and practice. I think this is what's very important. I'm not saying... Okay, but that protest also involved chants and signs, and I understand your case to be about the, as you put it, the passive expression of just wearing the armband. I think that's an important clarification, Your Honor. We are definitely asking this to do symbolic speech, displaying the XX wristbands, also the Protect Women sports signs in the parking lot, but the focus is on the XX wristbands. We are not asking to chant. We're not asking to talk to players. We're not asking to hold debates on the sidelines or anything like that. Okay, so, just pardon me, but I have a few more questions.  Suppose... Well, the school system obviously had some reason to worry about what might happen. Let's just take that as a given. But that's different than what actually happened, and what actually happened was merely the wearing of the symbolic speech.  But suppose it was an instance of an action that would cause harm to a player or someone who was a spectator there. Under those circumstances, could a school system engage in viewpoint discrimination? I think I would need to know more about the hypothetical. You know, it would be our position, Your Honor, that ideas are not themselves harmful and that the suggestion that displaying the XX wristband is always automatically harmful is the problem. What about the KKK symbol when you have a number of black players on the team? That would certainly be unpleasant and unkind speech, perhaps even more, but if BLM shirts are allowed in that forum, then the KKK symbols would have to be allowed, otherwise it's viewpoint discrimination. So you're saying avoid that question because there was no harm here and there was viewpoint discrimination? Yes. I'm trying to be very clear also, Your Honor, that I think that there's a strong social stigma against wearing KKK symbols, certainly in the Northeast. It would be true, hopefully, in most, if not all, of America. The XX symbol is a majority viewpoint, actually, within the state of New Hampshire and nationwide. It's very different. You have a situation where a smaller group of people with government power is using it to suppress a viewpoint that they disagree with. Yes, I can fully understand that people might well disagree with the federal court preliminary injunction that was issued by the District of New Hampshire, and certainly they have a right to protest that. So if you view the armband as a protest against that, then the question becomes, is it appropriate to do it in a school setting with spectators along a playing field where the athletes are actually playing? Well, the school district has an established history of allowing passive sociopolitical commentary on gender identity at its games. No, but that gets you back to the equivalence between gay rights and allowance of transgender. If I may quibble, Your Honor, we view sexual, and I think most people in the LGBTQ community would view sexual orientation as a separate issue from gender identity. So gay rights, sometimes people mash that together with gender identity, but they're actually quite separate concepts. We do agree that the XX message is fundamentally different than, say, the there are only two genders t-shirt that was at issue in the LM case. Counsel, can I, just speaking of the LM case, and I understand your arguments completely that this is not student speech, it's not tinker, it's a different analysis. So I agree with you on that, but it is still a school setting, and you haven't challenged the relevant policies on facial grounds, and as you know, one of the provisions in the policies is that the school can take steps to avoid disruptions or distractions to players at school sports events, and as a general principle, that seems like a reasonable goal that you haven't challenged on a facial basis. So there were arguments in the briefs and below about the disruption that the school thought and was very worried about would happen if your clients took the actions that they thought they were going to take. So one of the questions I had for you is, is there any evidence in the record or anything else you can share with the court about whether the type of expressive activity that you're saying is the correct comparator that creates the viewpoint discrimination had led to disruption in the past? There's no evidence of that. By the way, there's no evidence in our opinion that our client's speech led to disruption. For ten minutes they displayed these wristbands, nothing happened, until the school district officials intervened and asked them to remove them. I absolutely understand that, and I saw that in your argument. I think, again, sort of going back to LM, and I'm trying to, there's no case that's squarely on point here that I've been able to find. So I'm trying to understand how to do the analysis, again, paying very serious attention to the viewpoint discrimination issue, which I agree with you was not fully fleshed out below. But one of the principles that LM talks about is that school districts are allowed to make predictive judgments about what may happen in the future, and we are supposed to defer to them, at least under the Tinker line of cases. So if you have a policy, let me put it this way, do you agree that it's viewpoint neutral to have a policy that seeks to avoid disruption at school sporting events? Yes. On its face, it's viewpoint neutral. It could be applied in a viewpoint discriminatory manner, and we would argue that, we do argue that it happened in this case. Of course. I think I have a few answers that may address the court's concern. Please go ahead. May I go over? Okay. So for one thing, it's our position this is a limited public forum. That was conceded below. Yes. There's case law that supports that. The district court also used that in its analysis, and this is adult speech in a limited public forum. Anyone in the public can show up to this forum. That makes it fundamentally different than student speech in the classroom. So we would argue that the predictive, predicting ahead of time, which you can do more in the school context, you can't do that in the limited public forum. You have to show actual disruption or something better than just... Counsel, why would that be? Because if you're not bringing a facial challenge, in other words, if it is viewpoint neutral and at least okay under that part of the relevant First Amendment test for a school to say school sporting events should be about school sporting events, and we just don't want them to turn into protest rallies, whatever the issue may be. And so we're trying to think about what would be disruptive. Why is it okay for a school to make a predictive judgment? Why would it have to wait and see what... What under the First Amendment requires the school to wait until they see a disruption in order for them to take action? And I might fall back and as an alternative argument say the evidence of disruption has to be greater than it would be for students in the school setting. My concern, Your Honor, our concern is that if an overly deferential LM or tinker type standard on disruption prediction is applied to adults in a limited public forum, it's going to allow the school district officials to almost always say ex post after they've censored the adult speech, oh, well, we were predicting... We were concerned about counter protesters or we were concerned about disruption. It essentially becomes a get out of jail free card for viewpoint discrimination. The other thing that I think is a very, very important fact in this case is that the testimony from Marcy Kelly is unequivocal that the school district would apply its practice, its interpretive practice of how it applies this policy to ban the XX wristband at any bow sporting event regardless of whether any transgender player or any transgender audience member was present or known to be present. That illustrates that this is about the message expressed. It's not about disruption. It's not about preventing harm to transgender students because it is just the message being displayed at any bow event. It's not allowed to be displayed. I know the answer they give, you don't quite get off the hook because they say we have transgender students in our schools. We also have transgender employees who will be at the game. And that same message of disparagement is something we don't want addressed to them. So what's the response? Part of the response, Your Honor, is it's not a disparaging message. And individual offense or disagreement with a message, if that is allowed in a limited public forum to become a basis to censor speech, people are just going to complain and say I feel harassed by that message when they disagree with the message, when they don't want it to be heard. And it will lead to much more censorship in the First Circuit. Counsel, I think you're absolutely right to be very worried about a disparagement standard. But I guess just going back to what I'm trying to figure out just on a very practical level so that school sporting events don't devolve into protests that make it difficult for school sports to actually function is, you know, as you said, the record here reflects that your clients protested for ten minutes or wore the wristbands for ten minutes. Then school officials came and then certain things followed from there. But I just keep returning back to if the school is trying to avoid disruption and it has indication that if your clients continued to wear the wristbands that there would be a response, which there was in a sense here because there were other parents who started asking them to stop. And you know, there may be counter demonstrations. I don't think those are unreasonable predictions of what might happen. Is that, under the First Amendment analysis that applies here, if it's not viewpoint discriminatory to just have a policy that's about trying to forestall disruption? Why would it be problematic to say we don't want this to happen going forward because we think there are just going to be counter demonstrations and it'll be very disruptive for the kids who are playing? So again, they've allowed socio-political passive commentary in the past with messages that the school district agrees with, inclusionary messages. I understand. That's why I was asking if there was any evidence in the record that those led to disruptions of any kind. No, and we would argue that the only, that the disruption here occurred, if there was disruption, occurred because the school officials decided to intervene and censor my client's speech. No one was bothered by it in the audience. None of the players complained. There's not even evidence that any of the players even saw the XX wristbands in this case. And again, they said they would enforce this policy or practice of excluding the XX wristband at future events, regardless of whether any transgender player was present. Importantly, they would enforce it regardless of whether there was any disruption. I'd like to ask you a question about what you just said. With respect to these particular plaintiffs who were involved in the events of September 17, if the school makes a predictive judgment, knows that it might be wrong about that judgment, but makes the judgment that it's worried about what will happen, and so it does exactly what it did, it says, you know, remove the wristbands, leave, those sorts of things. The facts in the record suggest that there was some resistance to that. For purposes of an injunction going forward against these, not an injunction, but the behavior of these plaintiffs going forward, are we allowed to think about what the school might have thought the reaction to their enforcing a misjudgment would be in terms of disruption? So their prior restraint that they're trying to enforce, wrong as it may have been, resulted in some resistance, which itself from one perspective is disrupting the sporting event. Can the school take that into account with respect to these plaintiffs? So respectfully, Your Honor, I would reject the premise that my clients attempting to exercise their civil rights and push back on their censorship led to a disruption. The referee did stop the game at one point. He had been warned ahead of time by the athletic director that there might be a protest at the game, it's our view that he was sort of primed to look out for that issue. He came over and began... Does it matter how long the protester decides to stand and argue with the police officer? Does that fact matter? It could under some circumstances, and in our case, the game was stopped, and the officials chose to stop the game. Both the school district wanted that and the referee. The referee testified he was doing it at the behest of the school district. Our clients have a separate free speech retaliation claim that is not the primary basis of the preliminary injunction, but it's our view that also what contributed to this is that, and there's testimony that supports this, that Marcy Kelly in particular and the other school officials didn't like being criticized, particularly by Kyle Fellers, and what finally caused Kyle Fellers to be set off was when he called the athletic director a coward for not standing up for women's sports. They were offended by the criticism of government officials. That is the birthright of every American, to criticize government officials, particularly when your civil rights are being violated and you feel like you're being discriminated against. So I think what I'm trying to ask you, and you may have answered it, what I'm trying to ask you is, based on this record, what would cause a neutral observer to think that it will only be passive protest in the future with respect to these plaintiffs? They may have a right to do it, ordinarily, but if it's going to lead to these kinds of confrontations every time, if the school makes a misjudgment about when to step in and enforce, that's all I'm getting at. This is all our clients have asked us to do. That is all we've asked for in an injunction is a passive symbolic display. So yes, if people start chanting at the events, if they start disrupting the game, they start talking to specific players from the side. So we're putting the finer point on it that I'm looking for. So is a district court judge required to step back and look at it conceptually, or can the judge take the facts in the record to say, well, this time, whether the school was right or wrong, here's what happened. It escalated to at least a certain. Can the district court judge consider that in deciding what to impose for the future? He can consider it, but we think that the district court in this case focused unduly on the actual events of the game. Okay, why? Because he ignored the fact that they would enforce the policy regardless of whether there was any evidence of disruption and regardless of whether any transgender player was there. We obviously disagree with the district court's opinion, but there's a lot of talk in there about alleged psychological harm to the transgender, the well-known transgender player who was on the field. Well, they're going to impose this policy regardless of whether that player ever plays a bow again, regardless of whether any player who's transgender identifies as transgender is there or is in the audience. So if the concern is psychological harm, for example, if you're going to apply the policy It's the same with the alleged evidence of disruption. We disagree with some of the factual characterizations that the district court made with regard to the events on September 17th, but there's no evidence that that would necessarily be the case at a lacrosse game or a swim meet or a girls basketball game, all of which are events that my clients have testified in their declarations and on the stand that they would like to wear the XX wristband at. Judge Howard's question leads me to ask this. What do you want the school system to do? Do you want them to adopt a policy that no expressions related to political points of view can be allowed at all on a playing field? That is not what we're asking for. We're asking to be able to speak. No, no, no, no, no. I'm distinguishing between why you want a court to order and the policy that you think the school system ought to adopt, which would preclude disruptions. Yeah, so to answer, I think I understand what the court is getting at is won't this just lead to the closure of the forum? We don't believe it will, because there's such a long tradition of people at public school sporting events being able to express themselves passively, wearing legible clothing. Americans love to wear legible clothing. I'm sorry. School spectator parents get very engaged, and it's not just passive expression that happens there. Yeah, and by the way, I understand when it's directed at a particular player, and parents are heckling underage players on the field about their playing skills. That's an issue. We're not challenging that. We're just asking to wear the XX wristbands in the stands. Okay, so in the absence of proof of any actual injury, harm to the player, the school system needs to step back and not apply the policy to pink armbands. But suppose the school system adopts such a rule, and then, as Judge Howard was asking you, that then leads to counter-protests from parents who feel differently, which leads to disruptions. Then what happens? Then, if there's actual disruption of the game because people are noisily protesting, for example, then the school district probably could act illegally, and we're not asking for an injunction that would allow us to have a noisy, disruptive protest. I want to be clear that if progressive parents chose to wear a pride flag or a trans progress pride flag, which is the newer version of it, as a wristband, we don't have a problem with that. I would be happy to represent those people if they were censored also. Passive symbolic speech is fine. If it turns into a disruption where the focus becomes more protesters and counter-protesters and the kids can't play the game, that is different. We are not asking to do that. But you're just saying the school can't do that in advance. It has to wait and see if the disruption materializes. That's your position. Exactly. And our view is based on, again, we don't think the September 17th game matters as much as the district court felt it did because of the stated policy and practice of the school district that they would apply this policy, this interpretive framework, regardless of whether a transgender player was present, and obviously regardless of whether there was any disruption present. But if there was any disruption at the September 17th game, that came because of the censorship of the government officials, not because of what our clients did. My clients were wearing these wristbands for 10 minutes on the sidelines like this, just standing there. They weren't even saying anything to anybody. And it was when the school officials came over and started asking them to remove the wristbands, and they said, well, what, First Amendment? I have First Amendment rights. But your view is that the reaction of the parents that then followed asking your clients to stop so the game can continue, that we can't consider that just because it happened after the school officials came over? I mean, you can consider it as a background fact. They would have forced this policy regardless of whether the parents responded. Now, none of those parents did state their opinions when the game was already stopped. So the game was already stopped. And the reason the referee said he stopped the game was because the school district, the athletic official, wanted all wristbands removed on the sidelines. There were a few progressive parents who could be heard on the video saying, take it off. You're hurting the girls. This isn't the right. Write a letter to the editor. By the way, they were allowed to express their viewpoints without any attempt to censor them. The school district didn't say, don't express your view. The only people that got censored that day were my clients for wearing the XX wristband. The only people that got trespassed were Andy Foote and Kyle Fellers. That shows that the concern of the school district is with the XX viewpoint. The school district didn't have any problem with the progressive parents that were, quote, supporting the school district's views, expressing views the school district agreed with. More evidence of viewpoint discrimination, in our view. Thank you very much, counsel. Thank you. Thank you, counsel. At this time, would counsel for the Appalese please introduce himself on the record to  Jonathan Shirley for the defendants. I'm here joined today by my colleague, Brian Cullen. Thank you. Good morning. Speak up more. Certainly. Thank you and good morning. Jonathan Shirley for the defendants. We are here today because we think the district court got it right. We think the appeal that has been brought is fundamentally based on two false premises. And I'll start with the first. The first is that this was only ever intended on the September 17th game to be a silent protest as it's been described in the papers of the Appalese. We think that the district, our clients, had a reasonable apprehension that much more was planned and that if they didn't intervene, that it was going to get out of hand. That may be, but what actually happened was not disruptive and your clients adhered to the position that they took earlier, anticipating disruption. Correct. So what's your next argument? That people can make mistakes like that? I think that they have a, I think as school officials who are trying to monitor the integrity of an athletic event and they are aware of facts suggesting that there are a group of people who have arrived with a bag full of these wristbands. No, no, no. You're missing the point. They went through the whole first half of the game. They caused no disruption. They didn't even wear the armbands. They put on the armbands. No disruption from putting on the armbands. It was only when school officials, the athletic directors said, take off the armbands that any disruption happened. And I would respond by saying that the disruption was not the asking. The disruption was the refusal to follow the directive. And that in and of itself was a violation of policy KFA. If the directive was unconstitutional viewpoint discrimination, then you have a problem. If I don't know, if there, it would be a problem, but not then and there. They should have followed the directive of the school officials and taken it up later. And done what? File a lawsuit as they did? That would be one way to deal with it. Or go to the school board meeting and address it there. I think that, you know, that policy of trying to... They had communicated with the school board, with the superintendent, that they were opposed to allowing a transgender student to play, partly because of fear for the safety of their own daughters who were playing. And the school system said, we're under an injunction from the federal court. We have to go forward.  Yes. But why couldn't they just wear armbands? What's wrong with that? We didn't... The school officials and my, the premise that I'm trying to advocate for is that they had a reasonable apprehension that there was more planned. It began with putting on the wristbands. That didn't happen. They stopped it from happening. There had been information... What do you mean they stopped it from happening? All they did was wear wristbands. But the school officials' testimony and the evidence submitted at the hearing was that they came to believe that there was a greater plan afoot. And there was a bag, I mean, there was a bag of these wristbands. And maybe the number of wristbands of people on the sidelines wearing the wristbands doesn't matter in this court's view. But it begins with more than just three people wearing these wristbands. And a belief... I'm sorry, Your Honor. We're like ships passing in the night. You keep talking about what they reasonably feared would happen. But there is also testimony that they viewed wearing, your school officials viewed wearing the wristbands as inherently injurious to... And maybe I can go there then, if that's where... Speaking to... If it's just the wristbands, our client's position is that in and of itself is a form of communication to these students that should not be allowed. I mean, the point... Why? Because it is a... What is the evidence of injury to anyone from the wearing of the wristbands? The wristbands communicate a position that is to... It is communicating that we, standing here on the sidelines, don't want you on that field. You, player, shouldn't be here. That's the communication of that specific symbol. And that is a... That is a... The axis of communication that we're trying... That we say we're entitled to stop, or is anybody that shows up on the sidelines of a game and says, you know what? You player, you shouldn't be here. Now, it doesn't matter what reason you have for that opinion. You don't get to express it at these games. That's not a subject matter to be discussed at these games to these students. We believe that that was the reasonable... One of the reasonable apprehensions is that players on the field are aware what the symbol means. They are aware that it is a message to them that they shouldn't be on that field, in the opinion of that spectator. And that is the unique... And they didn't come to the playing field already knowing that? I'm sorry? Of course they came to the playing field already knowing that there was political expressed views that they shouldn't be there. And it... And the... And the particular plaintiff testified in front of the legislature on this point. But shouldn't... And our position is the school should have an ability to control how that message, that particular type of message gets communicated. And it doesn't matter that these students were transgender, that they were female, that they were black or white or Jewish. So what if there was a situation where a player on the other team was an illegal transfer into the school district, didn't actually live in the school district that they... to the team that they played, and there was some rule against that, that an armband saying we don't think this is right is to be prohibited? If I were advising my client that you can't allow that message. The decision was made to allow that player onto the field. Some official or set of officials said that player is going to play in the game. That player should not have to confront this protest that says, you know what, you shouldn't be there. And I think it fits into the category of the type of communication at a game like this where the subject matter of why you shouldn't be on the field player isn't allowed. And I would recommend that they ban that message too. Council, you of course agree that the test that we're applying here requires your policy to be viewpoint neutral. You can't discriminate based on viewpoint. So how would you best express what you think is the neutral policy that allows your client, the school, to prohibit the expressive activity that the plaintiffs want to engage in on a going forward basis? What is that viewpoint neutral policy in your view? The neutral viewpoint policy is you don't get to protest the right of players to play the game. And it doesn't matter your reason that you think that player shouldn't be on the field. But you don't get to show up. The subject matter of the right of that player to be there cannot be questioned and shouldn't be questioned in their presence. And that is what this type of wristband represents. The XX symbol and the testimony presented below demonstrate it. It says that the record is clear you would apply the policy even absent a transgender player on the field. The policy we think we need to enforce is because we can't know for sure if there is going to be a transgender student present. And that's the concern. We don't know, we can't know in future games, whether that's going to be someone present in the spectators or playing on the field. These are events where other schools bring their kids to participate. It's not always a complete knowledge base about who that population is. And so you have this unknowing piece of it. Okay, so your position seems to come down to once the school authorities have determined that a player can play, no one can wear any form of silent protest as to that decision on school property. If the message is, yeah, as it concerns athletic events.  Yeah. Okay. So the testimony below talked about sort of inclusionary versus exclusionary speech, but that doesn't seem to be the position that you're taking now. You're not defending that as a viewpoint neutral rule? Am I correct in my understanding? I think that those are layman frameworks for trying to express what I'm trying to express here in the sense that this idea of the dynamic of inclusory versus exclusory, and it is built on what I am trying to convey right now, which is the idea that some set of parents or spectators or the public show up to one of these events and starts projecting a message onto the field about the right of that player to be there is not a subject that should be presented then. And in that way, I would try to say that it is an inclusive versus exclusive parallel there. But it is still viewpoint neutral in the sense that we don't care if it's because it's a transgender issue. We don't care that it's because, frankly, if you just don't like left-footed kickers, that's not a reason you get to show up and express your dislike of them being on the  Let me go back to my most recent hypothetical, which was about the student who may have illegally transferred into the school district of the other team. So let's say that person wasn't allowed to play. Can you do a passive wristband that says he should be allowed to play? He's not even there. It is a different, and this tips into a more complicated answer, which is we're tipping into another feature of this communication having to do with the characteristic of the player. And the answer to your question is that may be a distinguishing feature of that specific circumstance. I want to know if it is. I think that showing up to say, you know, Sam should be here. And you guys made a big mistake not letting him be here. It is a communication that's very different in nature. Because it's not communicating to the present players. Well, it's communicating to the kid who came off the bench and filled his spot that he doesn't belong on the field. So does that change your answer? And wouldn't it be viewpoint discriminatory to permit a message saying you should be there but not a message that you can't be there? I don't know that that's, you know, taking a position that someone should be on the field that they're not. I don't know that that actually translates into, hey, sub, you shouldn't be here either. Because if we knew that Sam was here, you wouldn't have that job. That is a couple of steps that I can't quite connect up as being viewpoint discriminatory or hitting in the same level here that I'm trying to establish with you. I don't, you know, that answer as to whether someone can protest the absence of a player, I do think it cuts along a different axis than a rule where a school can. Now bringing it forward, am I wrong to be thinking that the XX wristband could be viewed as another player should have that position? We support the other player. Certain biological characteristics should have that position. Thank you. And that's a clarifying question in the sense that, you know, the Sam who's missing from the game, that very specific circumstance, doesn't have, I'm going to assume for the hypothetical, doesn't carry the same socio, all the baggage that has, say, developed around what we say is present here. You have this XX symbol that we believe has carried with it and developed with it a very specific twinned message, frankly, right? There is the plaintiffs here who say, no, no, no, we're looking at this from only the perspective of we really just want, you know, female born players, genetically female, by birth, playing on the field. And there's the school that says, well, that really, the other twin message is that the transgender students shouldn't be there. And that's an equally powerful message that a player could take from that, from seeing the XX band. And I think that that's the, that is why they have taken the position they have. You haven't answered the question. So, on Judge Howard's hypothetical, another player, born female, should have the position? And our position, and the response to that is we don't think that that's just the lone message conveyed by that symbol, and that it carries with it an exclusionary, it states two things at once. Certainly, the plaintiffs just want to look at the positive message. Judge Rickleman's question about exclusionary and inclusionary, and isn't that inherently viewpoint discrimination? I don't, the layman's language, I do, that we are, it can be misleading in that sense. I think if it's viewed for the prism of the school saying as a subject matter, we're not going to have a conversation about who shouldn't be on that field, particularly when it starts touching on characteristics of their sex or sexual identity, or other immutable characteristics such as their race, or beliefs, religious beliefs, you start entering into this zone where it doesn't matter your reasons you don't think they shouldn't be there, it shouldn't be communicated to them while they're playing on the field, and that they have to deal with that issue. And counsel, what is your, how do you hitch the way that you've presented the viewpoint neutral policy here to the actual written policies that we have in the record? In other words, what are you claiming it fits under in terms of what is in the text of your school's policy? Is it intimidation? Is it disruption? What is it? We view it as a harassment of these players based on their, you know, that is the connective tissue and that's how the district court viewed it, demeaning or harassing of this particular player. And it is in that context we say, and that could be true of any player who is presented with a group of people who are saying, we don't want you on that field, we don't think you should be on that field, for whatever reason, same interruption.  Sorry? That is harassment to say we don't agree you should be here? I think it is. All right. Assume one rejects your argument that that is harassment. What else under the policy? Is there anything else? It would be that we don't have, as a rule, we don't have this conversation. They are entitled to set the boundaries on a viewpoint neutral way, what the conversation that can be had in this limited public forum. And that conversation is not about who shouldn't be on that field. And that is how they get to set that rule. And it is not viewpoint discriminatory in the sense that we don't care that it is about transgender rights. We don't care that it is about some other issue you may have, particularly when it bears on that individual student's identity in some fashion, mutable or immutable. It shouldn't matter and they shouldn't be allowed to have that conversation there. Is the analysis any different for the parking lot versus the sidelines? No. And the signs, I mean, no, not anywhere in the school should that message be conveyed. And that's, you know, to start moving in the direction a little bit of how LM plays a role here is this acknowledgement and this message of, you know, we don't think you belong here, but we do, is how I would, you know, frame some of that communication in terms of what goes on in the parking lot. And it ties, and I'm well over time, please obviously tell me if I need to stop, but I, you know, we also reject that there's some sort of yin and yang relationship between, say, the symbol of the pride flag or the progress pride flag and the XX symbol. We don't view them as equivalents. We believe, and believe now, that the XX symbol carries a very specific message that is, you know, we don't think you belong, but these others do here at this school. And the papers that have been submitted by the appellees and some of the amicus, the appellants and some of the amicus, you know, they point to say, well, listen, the framework that really should be used is the pervasive harassment, severe and pervasive harassment line of case law. Here I'm thinking of the Wadsworth v. Winn and the Davis v. Monroe County, which is a line of cases that says if a school stands by and watches students be severely, pervasively denied the enjoyment of the benefit of the educational system, that they can be found liable for damages to do that. And ultimately, you know, that is where this school district finds itself here today. They're in a seemingly impossible position because they're supposed to allow conduct that they believe starts walking in that direction of speaking to students at this school saying, we don't think you should be part of that athletic program. And by the telling of the appellants, the school's supposed to just wait, wait until that becomes pervasive enough that it becomes a legal claim that they now have to resolve with that student because they didn't do their job. And that's sort of the impossible position that the district's court finds itself at this point. So it's your position the school can make a predictive judgment and say? They should be able to say, listen, we're not going to let that happen. What do you rely on? What's your best authority for concluding that it can make a predictive judgment in this circumstance? This isn't a tinker case. So is there something else you point us to? I mean, I would look to the Wadsworth and Davis dynamic and the idea that if the school doesn't intervene, it becomes its own legal claim that can be brought by that student or set of students. I was on the Wadsworth case. There was a lot of evidence of potential sexual abuse and impropriety visited by the principal on this particular girl. There is no such evidence here. I don't know that you can make a predictive judgment that if the wearing of armbands did lead to actual harm or harassment of students and the school system failed to take action on those facts, maybe that would be a viable argument. But on these facts, there was no harm that ensued. And we say... So you argue predictive judgment, but what happens when the predictive judgment proves not to be correct? Does the school system then have to modify its applications of its policies? I guess I'm not certain I'm following the question. You're saying courts have to defer all the time to the predictive judgments of school systems. I'm saying, suppose what actually happens out there shows the predictive judgments were wrong. If they're wrong, then they need to change that course. I would concede that if that is an answer to your question. I'm not sure I'm actually answering your question. But I guess where I would end my thoughts are, we have case law even today after Maytala v. Tam that acknowledges, I'm thinking here of Wandering Dago, the Second Circuit decision, which acknowledges that even after the Supreme Court's decision in Maytala v. Tam, speech still can take on effects of a hostile work environment or harassment. And entities like the school district should have an ability to step in and say, listen, we think we see where this is going. We need to stop you now. For a variety of reasons. The integrity of the rights of that student to remain unmolested by others shouting at them, adults no less, and be able to take that proactive measure. Especially if they allow this conduct to continue, as is asked by the plaintiffs here, to continue going to these events. You actually start moving in the direction, potentially, of a pervasive and severe circumstance. Poison is often determined by the dose. And we're talking about future events where we don't have an understanding of how many people are going to be showing up with these wristbands. Let's not forget that there were signs. They ended up on the cars. The original intent was to bring them to the field. And so you have, say, a basketball auditorium, stuffed to the gills with these wristbands. And signs plastered everywhere. And these students are supposed to show up and participate in a school activity. Very much like being at work. And you're going to have to expose yourself and be part of that. And is that a hostile environment? That's our concern. Thank you, Counsel. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellants please reintroduce himself on the record to begin? He has a three-minute rebuttal. Thank you, Endel Kold, again, for the plaintiffs. Your Honors, free speech is not poison. My learned colleague, representing the school district, and echoes Principal Fiske when he said, paraphrasing from my notes, the form of communication that's represented by these wristbands is a subject matter that should just not be allowed. He just admitted repeatedly on the record that it was viewpoint discrimination. They are concerned with the message. You don't belong here. It is pure viewpoint discrimination. That is what they don't want to be expressed, and they would not allow it to be expressed regardless of whether there was disruption or anything like that. In their view, just that one view, the XX chromosomes is automatically always harassment. You cannot protest the right of a particular player to play a game. That is clear viewpoint-based discrimination. I do want to engage briefly with some questions that Judge Rickleman had raised. So what's clear is they've not disavowed, and they've stuck to their guns on the inclusionary versus exclusionary interpretive framework for applying their policy. It is possible, also, so the school clearly would allow inclusive messages, and it is conceivable that one could have counter-protests, disruptive counter-protests, to inclusive messages also. The school is not asking to be able to censor that particular speech. With regard to the facts of the September 17th game, the audience response, the progressive parents, to the wristband was all after Fisk and the athletic director told the plaintiffs to remove the wristband. So it was after the intervention by the school district. It wasn't in reaction to seeing the wristband passively, quietly displayed on the sidelines. Counsel, just because we have a short amount of time, what about, you could call it a hypothetical or predictive judgment based on how you want to frame it, but your clients have said that they want to be able to wear the wristbands at a variety of activities, including in much smaller spaces, like at a swim meet or a basketball game, which are more enclosed. The speech is going to be much more easily visible to the players. And they're saying, essentially, that now that folks in the community know that these expressive activities may be happening going forward, it is just simply predictable that there will be counter-demonstrations and then you will have a school event that sort of has that valence to it of people protesting back and forth, and that that does become disruptive, harassing various words that they've used. In your view, I just want to understand, if that is what happened at the next sporting event, is that it became just wall-to-wall political speech of various viewpoints that the school decides is just disruptive to the people who are trying to focus on the sport. In your view, could the school act at that point? If there was actual disruption with noisy counter-protesters that were interfering with the event, yes, the school could act. Well, that's what I'm trying to understand, what you mean by disruption. So you think just a swim meet, small space with political signs plastered all over, that's not enough to be disruption in your view? I didn't mean to cut your honor off. No, please go ahead. First of all, I think a pool, not that small. I think the players are in the pool a lot. I am admittedly not a swimming parent. Look, if pro-transgender parents show up wearing pride flag shirts or wristbands and people who believe in the sex binary show up wearing XX wristbands quietly, there's no shouting, and there's no delay interference with the event, that is democracy in action. And that is what the school district should have allowed. The school district should have modeled tolerance and restraint. We don't all have to agree on transgender issues, but if we're going to get along in a pluralistic society, people have to be allowed to quietly express their views on terms equal to other parents. We all know that if they had worn pride flags, wristbands, we wouldn't be here today. Counsel, I very much understand your argument, I really do, but I'm just trying to zero in on what you would consider to be disruptive. So you think it is disruptive only if people are shouting? Is that the test that you would impose for disruption? I think that would be one test if they were shouting at the referee or one player. What if they're shouting at each other? If they were shouting at each other and it wasn't a stoppage in play due to the school officials trying to censor the speech, it might be different. So you don't think it's disruptive to players to have people shouting loudly about political issues while they're trying to compete? I mean, I've seen a lot of things shouted at. I'm just trying to understand what your view is. It might be. I would say it might be. And I think that if it was truly disruptive in a way that most people would agree would be disruptive, the school district can act to allow the athletic events to go forward. We're asking for equal access to be treated like everybody else. We're not asking to hijack the school's athletic events to turn them into political debates or anything like that. That's not what we're asking for. I would like to ask one question that doesn't have to do with disruption, but rather decorum. Does decorum play a role here at all? And the context that I want to put that in is what framework would you use? Maybe use the same framework. That's all I'm asking you. If the passive symbol is a gang symbol, a known gang symbol, is a swastika, is a religious symbol, is a satanic symbol? Yeah, you know, the swastika and the Klan hypo, they're always tough in limited public forums. I've litigated these kinds of cases on both sides, frankly. But it is true that if you allow a certain topic to be expressed, you can't exclude certain viewpoints. I think if the context of the situation is such that you have reason to believe that a particular symbol is going to elicit a stronger reaction than others, like you have a history of gang violence or something like that at a particular school, particular gangs warring with one another, that might provide, might tip the balance in favor of the school. The same might be true with regard to a Klan symbol or a Nazi swastika. Again, I want to be clear, even though some have made an attempt to equate the XXRist band with a Nazi swastika, it is not. It is a mainstream view held by the majority of residents of New Hampshire and the United States. Thank you. Thank you, Counsel. That concludes argument in this case.